IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

SHERRI M. GOEMMER,

    Plaintiff,

v.                                                                                                  No. Civ. 12-425 LH/RHS

TOTAL COMMUNITY CARE, L.L.C.
a Colorado limited liability corporation,

    Defendant.

## MEMORANDUM OPINION AND ORDER

On January 17, 2013, Defendant Total Community Care, L.L.C. ("Defendant" or "TCC") filed a Memorandum Motion for Summary Judgment (ECF No. 20). The Court, having considered the motion, briefs, evidence, relevant law, and otherwise being fully advised, concludes that Defendant's motion for summary judgment should be granted.

**I.      FACTUAL BACKGROUND**

TCC is a non-profit organization that provides services to the elderly, and it was the first New Mexico organization to participate in Programs of All-Inclusive Care for the Elderly ("PACE"). Decl. of Sherri M. Goemmer (ECF No. 22-2) ¶ 3. TCC hired Plaintiff to be its Executive Director and she began working for TCC on February 14, 2011. Def.'s Mot. Summ. J. (ECF No. 20), Undisputed Fact ("UF") ¶ 1.

Plaintiff was an at-will employee and TCC never made a commitment to employ her for any length of time. *Id.*, UF ¶ 2. Plaintiff understood that her direct supervisor was the Chief Operating Officer ("COO") of Total Community Options, Inc. ("TCO"), Gina DeBlassie. *Id.*, UF ¶ 3; Aff. of Gina DeBlassie (ECF No. 20-11) ¶ 2. TCO is the sole member/parent company

of TCC. Aff. of Gina DeBlassie (ECF No. 20-11) ¶ 2. As the COO, Ms. DeBlassie was responsible for overseeing operations in New Mexico and Colorado, and she spent part of the work week in New Mexico, and the rest of the week in Colorado. *Id.* ¶¶ 4-5. As the Executive Director, Plaintiff had the duty of working in collaboration with Ms. Blassie on the day-to-day operational activities and initiatives, as set forth in the Executive Director Position Description that Plaintiff received and personally reviewed while employed at TCC. Def.'s Mot. Summ. J. (ECF No. 20), UF ¶ 4. Ms. DeBlassie requested that Plaintiff establish a professional relationship with the TCC Board. *See* Aff. of Gina DeBlassie (ECF No. 20-11) ¶ 8. As part of her duties, Ms. DeBlassie also requested that Ms. Goemmer review the results of a CMS survey from 2009 and work on a corrective action plan for unmet elements of the CMS survey. *Id.* ¶ 9.

When Plaintiff started at TCC, Ms. DeBlassie was working out of the biggest office in the building, which Plaintiff understood and considered to be the Executive Director's office. Def.'s Mot. Summ. J. (ECF No. 20), UF ¶ 5. She was surprised that Ms. DeBlassie was in the office and working on site because she had been told in an interview that Ms. DeBlassie was working remotely. *Id.* Plaintiff thought that it was important to have the Executive Director's office in order to show consistency and establish herself as a leader. *Id.* On March 4, 2011, Plaintiff said to Ms. DeBlassie, "I need to move into the Executive Director's office so I can make this transition." *Id.* Ms. DeBlassie was very upset by this request. *Id.* Ms. DeBlassie told Plaintiff that she was tired of Plaintiff's Executive Assistant asking her when she was going to move out. *Id.* Nevertheless, Ms. DeBlassie moved into a conference room, but the situation between Plaintiff and Ms. DeBlassie was extremely awkward and very uncomfortable. *Id.*

On May 12, 2011, Plaintiff learned that the Medicaid Integrity Group wanted to schedule a meeting for May 19, 2011. *Id.*, UF ¶ 13. The Medicaid Integrity Group is a group of state

officials that reviews and audits Medicaid claims, identifies Medicaid overpayments, and provides education to Medicaid providers on program integrity issues. Decl. of Sherri M. Goemmer (ECF No. 22-2) ¶ 4. Ellen Costilla, the PACE Program manager at Medicaid, sent an email to Plaintiff on May 16, 2011, attaching a questionnaire that was to be reviewed and completed by the meeting on May 19, 2011. Def.'s Mot. Summ. J. (ECF No. 20), UF ¶ 13. In requesting completion of the questionnaire, Ms. Costilla recognized that it was a lot to pull together. *Id.*

On May 13, 2011, Plaintiff confronted Ms. DeBlassie about having gone out to lunch with two members of the management team. *Id.*, UF ¶ 7. Plaintiff thought it was inappropriate for Ms. DeBlassie to go to lunch with employees who reported to Plaintiff. *Id.* Nobody at TCC, however, had complained to Plaintiff about Ms. DeBlassie going out to lunch with members of the management team. *Id.* During the discussion, Ms. DeBlassie got upset and told Plaintiff that she was going to have to get over thinking that Ms. DeBlassie was spying on her. *Id.* Ms. DeBlassie asked Plaintiff if she wanted Ms. DeBlassie to work from home. *Id.*, UF ¶ 9. Plaintiff told her "that would be good," as Plaintiff did not want Ms. DeBlassie to work in the building. *Id.* Plaintiff then questioned Ms. DeBlassie's commitment to TCO. *Id.*, UF ¶ 10. Plaintiff told Ms. DeBlassie, "I don't think that you want to be the COO." *Id.* Plaintiff thought this question was appropriate because Ms. DeBlassie was acting in the Executive Director capacity, going to lunch with the management team, and had offered to work remotely, but did not move out of her office for three weeks. *Id.* Plaintiff believed Ms. DeBlassie was acting as the Executive Director because she was not guiding Plaintiff or giving her oversight or tasks. *Id.* During this May 13, 2011 meeting, Plaintiff also told Ms. DeBlassie that Ms. Costilla had contacted Plaintiff about the Medicaid Integrity Group meeting and that they were going to send TCC a request for

documents.  *See* Pl.'s Resp., Ex. A (ECF No. 22-1) at 117.  Ms. DeBlassie said nothing in response.  *Id.*, Ex. A (ECF No. 22-1) at 118.

Plaintiff later received by email the request for information from Ms. Costilla, which she forwarded to Toni Steinmetz, TCC's Quality Manager.  *See* Dep. of Sherri Goemmer (ECF No. 20-1) at 137-38.  Plaintiff did not forward the email to Ms. DeBlassie.  *See id.* at 137-38, 140.  Later that day, when Ms. Steinmetz was unable to provide some of the answers, Plaintiff scheduled a conference call with Ms. Steinmetz and Lori Rothwell, Vice President of Compliance, for May 17, 2011.  *See id.* at 138-40.  Plaintiff did not initially invite Ms. DeBlassie to the conference call.  *See id.*  Prior to the conference call, Ms. DeBlassie called Plaintiff and said, "Don't leave me out of the loop."  Dep. of Sherri Goemmer (ECF No. 20-2) at 245-46.  Plaintiff then forwarded Ms. DeBlassie the invitation for the meeting.  *See id.*

During the conference call, Ms. DeBlassie asked Plaintiff to try to reschedule the May 19, 2011 meeting with the Medicaid Integrity Group to have more time to prepare the answers to the questionnaire.  Def.'s Mot. for Summ. J. (ECF No. 20), UF ¶ 15.  Plaintiff contacted Ms. Costilla to ask whether the meeting could be rescheduled.  *Id.*  In response, Ms. Costilla explained that the meeting could not be rescheduled because the Medicaid Integrity Group consisted of individuals from other agencies.  *Id.*  Ms. Costilla expressed to Plaintiff that the Medicaid Integrity Group did not themselves have a lot of time to prepare and they were notified basically the same day that she notified Plaintiff.  *Id.*

Ms. DeBlassie never told Plaintiff or suggested to her that she should refuse to attend the meeting.  *Id.*, UF ¶ 16.  Before the meeting occurred, Ms. DeBlassie knew the meeting was going forward and helped put together and approve the materials supporting the questionnaire.  *Id.*  As requested, TCC provided the Medicaid Integrity Group with the questionnaire and supporting

4

documents in advance of the meeting.  *Id.*

Plaintiff attended the May 19, 2011 meeting as scheduled, during which the Medicaid Integrity Group requested the following additional documents:  (i) a copy of the TCC Compliance Plan, a document that details the procedures that TCC follows to ensure that PACE regulations are met; (ii) TCC's template for contracts with subcontractors; (iii) TCC's policies related to certain enumerated federal regulations regarding disclosures by providers and fiscal agents regarding ownership, business transactions, and conviction of crimes; and (iv) TCC's policies related to Medicaid abuse, waste, and fraud.  Dep. of Sherri Goemmer (ECF No. 20-1) at 175-76; Decl. of Sherri M. Goemmer (ECF No. 22-2) ¶ 5.  That afternoon, Plaintiff made several inquiries in an effort to obtain the requested documents.  Decl. of Sherri M. Goemmer (ECF No. 22-2) ¶ 6.  Toni Steinmetz told Plaintiff that TCC did not have a Compliance Plan; instead TCC had a copy of the Compliance Manual for its parent company with post-it notes where changes needed to be made.  *Id.*  A Compliance Plan, to be valid, should be approved by a Board of Directors and should be available to all managers, particularly the quality assurance manager and Vice-President of Compliance.  *Id.* ¶ 10.

On May 19, 2011, after the meeting, Plaintiff emailed Ms. DeBlassie informing her of the Medicaid Integrity Group's request for the additional documents.  Dep. of Sherri Goemmer (ECF No. 20-1) at 177.  In the email, Plaintiff noted that Toni Steinmetz had mentioned that TCC had plans to update, but had not done so, and Plaintiff asked for an opinion as to whether to "forward the TLC plan and let them know we will have a TCC plan or it is the intention to revamp the TLC plan to include TCC?"  Aff. of Gina DeBlassie, Ex. A (ECF No. 20-11).  Ms. DeBlassie sent Plaintiff an email at 2:26 p.m. that same afternoon stating, "TCC does have a compliance plan based on TLC's.  I'll send it to you this evening.  We can discuss [the federal regulations]

5

tomorrow." *Id.* Ms. DeBlassie, by return email sent at 2:27 p.m., asked Plaintiff what date she needed to submit the documents to the State, to which Plaintiff responded by email later that day that they did not provide a specific deadline. Dep. of Sherri Goemmer (ECF No. 20-1) at 177-78; Def.'s Mot. for Summ. J., Ex. H (ECF No. 20-10). Plaintiff never told Ms. DeBlassie that the document request was urgent. Dep. of Sherri Goemmer (ECF No. 20-1) at 177-78.

On May 20, 2011, TCC terminated Plaintiff. Def.'s Mot. for Summ. J. (ECF No. 20), UF ¶ 18. On the day of her termination, Ms. DeBlassie called Plaintiff into the Human Resources office and stated, "This hasn't been working for a while." *Id.* Ms. DeBlassie recommended to Maureen Hewitt, the CEO, that Plaintiff be terminated. *Id.* TCC's Human Resources Manager told Plaintiff that she was only informed on May 19, 2011, that TCC intended to terminate Plaintiff's employment. *See* Decl. of Sherri M. Goemmer (ECF No. 22-2) ¶ 11.

No one at TCC had expressed any concerns to Plaintiff about her poor performance prior to Plaintiff's termination. *See id.* ¶ 7.[1] Although Ms. DeBlassie on or about May 13, 2011, had asked Plaintiff if she was working on the strategic plan with the Board President, Ms. DeBlassie never specifically expressed to Plaintiff her concern that Plaintiff was not working fast enough to establish relationships with the TCC Board. *See* Dep. of Sherri Goemmer (ECF No. 20-1) at 140; Decl. of Sherri M. Goemmer (ECF No. 22-2) ¶ 8.[2] Additionally, although Ms. DeBlassie requested that Ms. Goemmer work on a corrective action plan for unmet elements of the 2009

---

[1] The parties dispute whether there are documents generated before May 20, 2011, reflecting concerns about Plaintiff's performance. Defendant points to Exhibit M (ECF No. 24-4), which is titled "Sherri Goemmer Termination Documentation." No affidavit accompanies Exhibit M so it is unclear who created the document and when. In light of the lack of foundation supporting the document, this Court will not rely on Exhibit M to prove when Defendant knew of complaints regarding Plaintiff's performance. Nor will the Court rely on double hearsay statements contained within Exhibit M, unless such statements are supported by admissible evidence elsewhere in the record.

[2] Defendant asserts additional facts to support its argument that Plaintiff never worked sufficiently with the Board prior to her termination, citing pages 142 and 145 of Ms. Goemmer's deposition. Those pages, however, are not in the Court's record. The Court nonetheless found the evidence unnecessary for its decision, so it has not considered the purported evidence.

CMS survey, Ms. DeBlassie never told Plaintiff of any concerns regarding Plaintiff not working on the corrective action plan. *See* Aff. of Gina DeBlassie (ECF No. 20-11) ¶ 9; Decl. of Sherri M. Goemmer (ECF No. 22-2) ¶ 9. Plaintiff held weekly meetings to work on the corrective plan. Decl. of Sherri M. Goemmer (ECF No. 22-2) ¶ 9.

There were, however, points in time during her employment that Plaintiff knew it was not working out well with TCC. Dep. of Sherri M. Goemmer (Doc. 20-3) at 254. Plaintiff experienced periods of unhappiness at TCC, partly because she felt Ms. DeBlassie could not let go of the Executive Director position and wanted too much oversight of her position, while Plaintiff wanted to make the job her own. Def.'s Mot. for Summ. J. (ECF No. 20), UF ¶ 6. While still employed and during some of the difficult times, including on or about May 17, 2011, Plaintiff reached out to Ryan Escher, a Robert Half recruiter, to see if he had any job opportunities. *See* Dep. of Sherri M. Goemmer (Doc. 20-3) at 253-55.

Sometime subsequent to Plaintiff's termination and under Ms. DeBlassie's supervision, TCC provided all of the information and documents the Medicaid Integrity Group requested at the May 19, 2011 meeting. Aff. of Gina DeBlassie (ECF No. 20-11) ¶ 18.[3]

The parties dispute the reasons behind Plaintiff's termination. Defendant contends that Ms. DeBlassie recommended Plaintiff be terminated because Plaintiff was unable to collaborate with her or work under her supervision on the day-to-day operational activities of the company; Plaintiff failed to work on establishing a professional relationship with the Board; Plaintiff failed to work on a corrective action plan for unmet elements of a 2009 CMS survey; and Plaintiff was

---

[3] Plaintiff disputes the fact that Defendant has shown that it produced all requested documents to the Medicaid Integrity Group, arguing that Defendant has produced no documents supporting the fact. Defendant, however, rightly points out that Ms. DeBlassie's affidavit is competent evidence to support the fact that TCC produced the requisite documents. Additionally, Defendant in its reply attached an email from a TCC manager indicating that TCC attached a copy of its Compliance Plan to an email sent to the State of New Mexico on May 25, 2011. *See* Def.'s Reply, Ex. J (ECF No. 24-1). Plaintiff has produced no evidence to contradict the evidence before the Court, so it deems the fact undisputed for purposes of the motion for summary judgment. *See* Fed. R. Civ. P. 56(e)(2).

frequently absent from the facility and did not perform duties that were expected to nurture community relationships for the organization. *See* Aff. of Gina DeBlassie ¶¶ 8-13, 19-20. In contrast, Plaintiff asserts she was fired "to prevent Plaintiff from exposing the fact that Defendant had failed to maintain documentation required for Medicaid compliance." Pl.'s Resp. (ECF No. 22) at 7. Plaintiff argues that Defendant's proffered reasons are pretext for its true reason for firing her.

On March 19, 2012, Plaintiff filed a one-count complaint for termination in violation of public policy. *See* Compl. (ECF No. 32-1). Plaintiff alleges in her complaint that she performed acts public policy has authorized and would encourage when she met with the Medicaid Integrity Group, when she refused to comply with Defendant's demands that she not meet with the Medicaid Integrity Group, and when she asked Defendant to comply with the Medicaid Integrity Group's request for information and documents. *See id.* ¶¶ 24-26. Plaintiff asserts that Defendant terminated her employment in retaliation for the protected acts she performed. *See id.* ¶ 28. Defendant has moved for summary judgment on the sole count in the complaint.

## II.   STANDARD

Summary judgment is appropriate only if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.* (internal quotations omitted). Under Rule 56(c), the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment.  *Id.* at 248.

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists.  *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993).  Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial.  *Id.*  The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *See Anderson*, 477 U.S. at 248.

### III. ANALYSIS

New Mexico recognizes the tort of retaliatory discharge in which a discharged at-will employee may recover in tort when her discharge contravenes a clear mandate of public policy.  *Chavez v. Manville Products Corp.*, 108 N.M. 643, 647, 777 P.2d 371, 375 (1989).  Retaliatory discharge is a "narrow exception" to the employment at will rule.  *Shovelin v. Central New Mexico Elec. Coop., Inc.*, 115 N.M. 293, 304, 850 P.2d 996, 1007 (1993).  An employee must show that she was discharged because she performed an act that public policy has authorized or would encourage, or because she refused to do something required of her by her employer that public policy would condemn.  *Chavez*, 108 N.M. at 647, 777 P.2d at 375 (quoting *Vigil v. Arzola*, 102 N.M. 682, 689, 699 P.2d 613, 620 (N.M. Ct. App. 1983), *rev'd on other grounds*, 101 N.M. 687, 687 P.2d 1038 (1984)).  The employee additionally must demonstrate that the employer knew or suspected that the employee's action involved a protected activity and that there was a causal connection between her actions and the retaliatory discharge by the employer.

*Shovelin*, 115 N.M. at 303, 850 P.2d at 1006; *Weidler v. Big J Enterprises, Inc.*, 1998-NMCA-021, ¶ 23, 953 P.2d 1089 (1997).[4]

The linchpin of the retaliatory discharge tort "is whether by discharging the complaining employee the employer violated a 'clear mandate of public policy.'" *Shovelin*, 115 N.M. at 303, 850 P.2d at 1006 (quoting *Vigil*, 102 N.M. at 688, 699 P.2d at 619). "A clear mandate of public policy sufficient to support a claim of retaliatory discharge may be gleaned from the enactments of the legislature and the decisions of the courts" and may fall into one of the following categories: (i) legislation defining public policy and providing a remedy for violation of that policy; (ii) legislation providing protection of an employee without specifying a remedy; (iii) legislation defining a public policy without specifying either a right or remedy, requiring judicial recognition of both; and (iv) instances where there is no expression of public policy and the judiciary would have to imply a right and remedy. *Id.* Not every expression of public policy, even if set forth in a statute, will suffice to state a claim for retaliatory discharge. *Id.* The employee must identify a specific expression of public policy in order to state a claim. *See id.* at 303-04, 850 P.2d at 1006-07.

Plaintiff's theory is that she was fired after inquiring about documents that had been requested by the Medicaid Integrity Group in order to prevent her from exposing the fact that Defendant had failed to maintain documentation required for Medicaid compliance. Although the facts show that the Medicaid Integrity Group requested TCC's Compliance Plan, Plaintiff has not cited to a specific statute or regulation, or any other source of law, requiring an organization

---

[4] Defendant argues that the burden-shifting analysis of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), is the appropriate framework for considering retaliatory discharge claims. It is unclear whether New Mexico utilizes a shifting burden of production in retaliatory discharge cases. *See Shovelin*, 115 N.M. at 303 n.8, 850 P.2d at 1006 (noting that some jurisdictions had utilized a shifting burden of production but not deciding issue). This Court need not decide the issue because, using either analysis, Plaintiff cannot meet her burden of demonstrating that Defendant violated a clear mandate of public policy or that she performed a protected act.

like TCC to have a Compliance Plan, and if so, whether the statute or regulation creates a remedy or whether the judiciary would have to imply a remedy.  Plaintiff's lack of specificity on this issue leaves the Court bereft of evidence or law to determine the importance of the requisite Compliance Plan.  Moreover, under Plaintiff's own facts, she had information that TCC's parent company, TCO, had a Compliance Plan.  This Court is unable to determine why producing TCO's Compliance Plan would have been an insufficient response to the Medicaid Integrity Group's request and a clear violation of public policy.  In short, Plaintiff has failed in her burden of identifying a specific expression of public policy in order to state a claim.  *Cf. Shovelin*, 115 N.M. at 308, 850 P.2d at 1011 (holding that complaint for retaliatory discharge failed to state a claim because it failed to assert a sufficient public policy).

In a similar vein, Plaintiff's version of the facts does not show that she performed an act that public policy has authorized or would encourage, or that she refused to do something required of her by her employer that public policy would condemn.  Although Ms. DeBlassie asked Plaintiff to see if the Medicaid Integrity Group would reschedule the meeting, Ms. DeBlassie never told or suggested to Plaintiff that she should not participate in the meeting or that she should in any way interfere with the Medicaid Integrity Group's requests for information.  There is nothing in the record suggesting that Defendant asked Plaintiff to do something in violation of any Medicaid regulations or other public policy mandate, and that she refused to do it.

The only act that Plaintiff points to is her inquiry of Ms. DeBlassie and other managers, "should we forward the TLC plan and let them know we will have a TCC plan or [is it] the intention to revamp the TLC plan to include TCC?"  Plaintiff has not shown that this question constitutes an act protected by the tort of retaliatory discharge.  Plaintiff asserts that a jury could

infer that, based on the timing of her termination, she was fired because Plaintiff may have exposed to the Medicaid Integrity Group TCC's failure to maintain the requisite Compliance Plan.  The first fatal flaw in this argument is that the evidence shows that TCC produced the requisite Compliance Plan to the Medicaid Integrity Group.  Plaintiff has produced no evidence indicating that her inquiry actually exposed wrongdoing on the part of Defendant.  Although Toni Steinmetz informed her she only had TCO's plan, Ms. DeBlassie responded that TCC actually did have its own Compliance Plan based on TLC's.  The record also shows another manager attached TCC's Compliance Plan to an email to the State of New Mexico on May 25, 2011.  Plaintiff has given the Court nothing to contradict these facts or to show that the Compliance Plan sent to the State was somehow deficient.  Plaintiff has not established any kind of factual basis to indicate any wrongdoing by Defendant on which she could blow the proverbial whistle.  *Cf. McPeek v. Hubbard Museum*, No. 27,424, 2010 WL 4060312, at *4 (N.M. Ct. App. Mar. 16, 2010) (unpublished opinion) ("In the present case, Plaintiffs failed to establish a prima facie case that Defendant had engaged in any wrongdoing at all. In the absence of wrongful conduct, we cannot say that public policy would encourage Plaintiffs' reporting of Defendant's actions. Moreover, allowing Plaintiffs' claim to proceed under these circumstances would unduly broaden the retaliatory discharge exception to at-will employment.").

The second problem in Plaintiff's theory is that the record, construed in her favor, does not support that she was fired to prevent her from exposing the lack of a Compliance Plan to the Medicaid Integrity Group.  Plaintiff only inquired as to the status of the Compliance Plan because the Medicaid Integrity Group itself was asking TCC to produce the Compliance Plan.  If TCC did not have the requisite Compliance Plan, the omission would have been exposed due to the Medicaid Integrity Group's own inquiries.  Plaintiff has not shown that firing her would have

prevented the Medicaid Integrity Group, which was spearheading the questionnaire, from learning about the status of the Compliance Plan. Plaintiff thus cannot show that Defendant knew or suspected that Plaintiff's email to them involved a protected activity.

The Court recognizes that an employee reporting an employer's misuse of public funds can support a retaliatory discharge claim. *See Vigil*, 102 N.M. at 690, 699 P.2d at 621. This Court's decision today cannot be read as holding that an employee's being fired for reporting or attempting to report an employer's Medicaid overpayments or violation of other Medicaid regulations can never state a retaliatory discharge claim. Rather, the facts, as construed in Plaintiff's favor, simply do not show wrongdoing by Defendant or that Plaintiff was fired because TCC wanted to prevent her from exposing any violation of Medicaid regulations.

**IT IS THEREFORE ORDERED** that

1. Defendant Total Community Care, L.L.C.'s Memorandum Motion for Summary Judgment (**ECF No. 20**) is **GRANTED**; and

2. This case is **DISMISSED WITH PREJUDICE**.

_____
**SENIOR UNITED STATES DISTRICT JUDGE**